UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SARA J. KUBIK,

                    Plaintiff,                           Case No. 15-cv-12055

v.                                         Honorable Thomas L. Ludington

CENTRAL MICHIGAN UNIVERSITY
BOARD OF TRUSTEES, et al.,

                    Defendants.
_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

       Plaintiff Sara J. Kubik brought suit against the Central Michigan University Board of Trustees ("CMU") and several members of the faculty and university administration on June 5, 2015. ECF No. 1. Plaintiff contends that CMU refused to reappoint her as a tenure-track professor in the Journalism Department and took other discriminatory action because she became pregnant. The Complaint alleged four counts: sex/pregnancy discrimination under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*; sex discrimination under the Elliot Larsen Civil Rights Act ("ELCRA"), M.C.L. 37.2101, *et seq.*; pregnancy discrimination under the ELCRA; and retaliation in violation of both Title VII and the ELCRA. On March 8, 2016, the parties stipulated to the dismissal of all of Plaintiff's claims under Title VII against the individual defendants. ECF No. 30. At the close of discovery, Defendants filed a motion for summary judgment. ECF No. 41. For the reasons stated below, Defendants' motion for summary judgment will be granted.

**I.**

Sara Kubik was hired by CMU on August 15, 2011, as a tenure-track assistant professor in the Journalism Department. Offer Letter, ECF No. 52, Ex. 1. Faculty members in the Journalism Department are hired onto one of two "tracks": the traditional academic track and the distinguished media professional track. Journalism Dep. Bylaws at 22, ECF No. 52, Ex. 47. Kubik was hired onto the academic track. Rec. Against Reappointment 2016–2017, ECF. No. 52, Ex. 50. Defendant Maria Marron was the Department Chair for the Journalism Department from 2011 until early 2014, when she accepted a position at the University of Nebraska-Lincoln. Resignation Letter, ECF No. 41, Ex. 27. Defendants Lori Brost and Timothy Boudreau are tenured professors in the Journalism Department. Oct. 2014, OCRIE Compl. at 2, ECF No. 52, Ex. 58. Defendant Michael Gealt is the Executive Vice President and Provost of CMU. Personnel Rec. for 2015–2016 Term, ECF No. 52, Ex. 25. Defendant Shelly Hinck was the Interim Dean of CMU's College of Communcations and Fine Arts during the fall of 2014. Rec. Against Reappointment, ECF. No. 52, Ex. 50.

## A.

The CMU Faculty have entered into a Collective Bargaining Agreement (CBA) with the University. 2011–2014 CBA, ECF No. 52, Ex. 13; 2014–2019 CBA, ECF No. 41, Ex. 2. The 2011–2014 Collective Bargaining Agreement between CMU and the CMU Faculty Association provides policies for reappointment and tenure decisions at CMU. 2011–2014 CBA, ECF No. 52, Ex. 13.[1] Tenure, of course, is the employment status that "protects academic employees from dismissal absent serious misconduct, incompetence, or financial exigency." Robert J. Tepper & Craig G. White, *Speak No Evil: Academic Freedom and the Application of* Garcetti v. Ceballos *to Public University Faculty*, 59 Cath. U. L. Rev. 125 (2009). According to the CMU CBA,

---

[1] CMU and the CMU Faculty Association entered into a new CBA for 2014–2019. 2014–2019 CBA, ECF No. 41, Ex. 2. The two agreements appear to be materially identical in all relevant respects, and the parties do not argue that the new CBA changed the process or standards for reappointment and tenure decisions.

"[t]enure is one way in which the freedom to teach and to do research without arbitrary interference is protected. This protection of academic freedom is the fundamental purpose of tenure." 2014–2019 CBA at 29–30, ECF No. 41, Ex. 2. Because a primary purpose of tenure is to protect faculty from chilling oversight or censorship by the administration,[2] tenure decisions are made primarily by the academy, with later review by the administration.[3] The CMU Faculty Union entered into a CBA with CMU which governs tenure and reappointment decisions, and this Court must be careful not to disturb the balance between academic freedom and academic excellence reflected in that CBA. As a faculty member, Kubik agreed to subject herself to the CBA procedures and standards for reappointment.

According to the CBA, the quality of teaching and the quality of scholarly achievement are both important factors in reappointment and tenure decisions. *Id.* at 23. The CBA explains that

---

[2]  *See* John M. Badagliacca, *The Decline of Tenure: The Sixth Circuit's Interpretation of Academic Tenure's Substantive Protections*, 44 Seton Hall L. Rev. 905, 911 (2014); Robert J. Tepper & Craig G. White, *Speak No Evil: Academic Freedom and the Application of* Garcetti v. Ceballos *to Public University Faculty*, 59 Cath. U. L. Rev. 125, 135 (2009).

[3]  In 1966, the American Association of University Professors, the American Council on Education, and the Association of Governing Boards of Universities and Colleges released a joint statement calling for "appropriately shared responsibility and cooperative action between the components of the academic institution," especially the faculty and administration. *See* Statement on Government of Colleges and Universities, https://www.aaup.org/report/statement-government-colleges-and-universities. In asserting that the faculty has "primary responsibility" for decisions regarding faculty status, the Statement explained, in part, as follows:

> Faculty status and related matters are primarily a faculty responsibility; this area includes appointments, reappointments, decisions not to reappoint, promotions, the granting of tenure, and dismissal. The primary responsibility of the faculty for such matters is based upon the fact that its judgment is central to general educational policy. Furthermore, scholars in a particular field or activity have the chief competence for judging the work of their colleagues; in such competence it is implicit that responsibility exists for both adverse and favorable judgments. Likewise, there is the more general competence of experienced faculty personnel committees having a broader charge. Determinations in these matters should first be by faculty action through established procedures, reviewed by the chief academic officers with the concurrence of the board. The governing board and president should, on questions of faculty status, as in other matters where the faculty has primary responsibility, concur with the faculty judgment except in rare instances and for compelling reasons which should be stated in detail.

*Id.*

> [d]epartmental colleagues are . . . best informed and are in the best position to arrive at specific criteria and standards to evaluate a bargaining unit member's work. It is therefore the responsibility of departments to develop and systematize these criteria and standards so that they may serve as guidelines for departmental recommendations regarding reappointment, tenure, and promotion.

*Id.*

Specifically, departments are instructed to develop standards for analyzing the following bases of achievement: teaching, scholarly and creative activity, and university service, "which may be supplemented by professional service or public service." *Id.* at 24. Likewise, the department should consider the "promise of a bargaining unit member," which includes the member's "potential for professional growth and development" as well as whether "the bargaining member will contribute to the goals and objectives established by the department." *Id.* The department should also consider whether the university is likely to have a future need for the member. *Id.*

Once initially hired, a new member of the faculty generally receives an initial appointment of two years. *Id.* at 26. The non-tenured faculty member is thereafter considered for reappointment on a yearly basis, until the tenure decision is made. *Id.* Reappointment requires a two-thirds favorable vote. If a faculty member is not reappointed, the CBA requires CMU to notify that faculty member of the non-reappointment at least twelve months in advance of the expiration of the current appointment term. *Id.* at 27.

Tenure consideration happens at different times, depending on the faculty member's rank when originally appointed. *Id.* at 28. Faculty members appointed as assistant professors, like Kubik, are typically considered for tenure during their eleventh semester of employment at CMU. *Id.* However, sometimes "[c]ircumstances may make it necessary to delay consideration for the grant of tenure." *Id.* Those circumstances include "extended absence or disability due to illness or injury, acute family/personal responsibilities (including child care or the birth or

adoption of a child), . . . and unexpected delays in scholarly achievement due to circumstances beyond the control of the bargaining unit member." *Id.*

Decisions regarding reappointment and tenure occur in several stages. First, the faculty member's department makes a recommendation, based on the department's existing standards. *Id.* at 32. The department's recommendation is then forwarded to the dean in charge of the department. *Id.* at 32–33. The dean, applying the department's criteria and standards, considers the department's recommendation and then "renders an independent judgment." *Id.* at 33. The dean's recommendation is then forwarded to the university Provost *Id.* The Provost likewise applies the department's standards and makes an independent decision regarding whether the faculty member should be reappointed or granted tenure. *Id.*  at 34.

In compliance with the CBA, the Journalism Department has promulgated bylaws which establish standards and criteria for reappointment and tenure decisions. First, "[a] faculty member will be evaluated for reappointment, tenure, and promotion primarily according to the 'track' on which the initial appointment was made." Journalism Dep. Bylaws at 22. Regardless of the track, however, the department evaluates applicants based on the three areas identified in the CBA: teaching, scholarly and creative activity, and university service. *Id.* The faculty member applying for reappointment or tenure has the responsibility of providing evidence of accomplishment in each area.

Relevant teachings activities include teaching courses, advising students, writing student recommendations, participating in student conferences and workshops, and receiving teaching awards. *Id.* at 23. Evaluation of a faculty member's scholarly activities depends on the track onto which that member was appointed. *Id.* at 24. According to the bylaws, "[t]he majority of the candidate's work will relate to that track." *Id.* The bylaws explain that scholarly and creative

activities are expected to "be refereed or juried using a system in which expert referees are invited or employed to evaluate the merits of the material or activity." *Id.* at 25. The bylaws provide examples of academic track material and professional track material. Academic track material includes:

  -- Bibliographies
  -- Books authored, co-authored, or edited by the candidate
  -- Book reviews
  -- Chapters in books
  -- Articles in scholarly journals
  -- Monographs
  -- Papers published as part of conference or convention proceedings

*Id.*

Professional track material includes:

  -- Books
  -- Articles in professional journals
  -- Articles in newspapers or magazines
  -- Broadcast productions
  -- Photographs and other visual materials
  -- Reviews or commentaries in professional publications
  -- Professional studies or reports

*Id.*

The bylaws also include examples of scholarly activities that are not track-specific: presenting papers at academic organizations, presenting papers at professional organizations, performing speeches and presentations, receiving grants or awards, or serving as a referee or reviewing for a publisher of academic or professional materials. *Id.* at 25–26.

  The candidate bears the burden of providing of the quality and relevance of the scholarly activities. *Id.* at 26. The bylaws also provide standards for "assessing the quality of scholarly and creative activites." *Id.* Specifically, the review should consider the "reputation of the academic or professional publications," the "scope (whether international, national, regional, statewide, or

- 6 -

local) of the academic or professional publications," the length, complexity, and frequency of the activity, and the "relevance of the activities to the department's mission." *Id.*

When being considered for reappointment, a candidate must demonstrate "progress in research and research planning." *Id.* at 32. When being considered for tenure, however, an assistant professor must "show evidence of scholarly and creative activity," including at least "three types" of the activities already mentioned. *Id.* Further, "[a]t least two of the activities should be refereed, juried, or independently assessed publications or exhibitions." *Id.*

Finally, the bylaws specify that the candidate bears the burden of providing evidence of university or professional service. *Id.* at 27. That can mean involvement in academic or professional organizations, attendance at academic or professional workshops, receipt of grants, or professional consulting. *Id.* at 27–28. Candidates must also provide evidence of service to the department, the university, and/or the university's constituent communities. *Id.* at 29. Typically, that means service on departmental and university committees. *Id.* at 29–30.

**B.**

**1.**

When being considered for reappointment, non-tenured faculty members at CMU have a meeting with their dean and the chairperson of their department, pursuant to Article 6 of the CBA. Jan. 18, 2012, Art. 6 Letter, ECF No. 41, Ex. 4. On February 9, 2012, Kubik met with Dean Salma Ghanem and Department Chair Maria Marron. Feb. 11, 2012, Art. 6 Letter, ECF No. 41, Ex. 5. At the meeting, Dean Ghanem and Dr. Marron told Kubik that she was "making satisfactory progress in the areas of teaching and service." *Id.* However, they indicated that she was making only "limited progress in scholarship/creative endeavors as it relates to

- 7 -

reappointment." *Id.* Kubik was subsequently reappointed for the 2012–2013 academic year. Sept. 28, 2012, Personnel Comm. Meeting, ECF No. 52, Ex. 5.

On October 19, 2012, Kubik submitted her first formal application for reappointment, pursuant to the CBA and department bylaws. Reappoint. App. 2012, ECF No. 52, Ex. 6. The application discussed Kubik's teaching activities, scholarship, and service. She indicated that, in the year since she was hired, she had taught four courses. *Id.* at 3. In terms of scholarly activities, Kubik listed two works in progress. *Id.* at 33. The first was tentatively titled: "The parallel between visual communication elements used by journalists and those used by lawyers." *Id.* The second was tentatively titled: "The editing of visual content: How much is too much and when does the content become false?" Finally, Kubik indicated that a panel proposal, coauthored by the 16 panelists, entitled "Internet-Based Technologies for Developing Intercultural Professional Competence in Russian and US Universities" had been accepted for presentation at an upcoming conference. *Id.* Kubik admitted that "my research is currently my weakest area," but explained that this was because her past publications did not have a focus on journalism, meaning she was starting anew with her research. *Id.* For professional service, Kubik indicated that she had sponsored two workshops. *Id.* at 34. For university service, Kubik stated that she was a member on three committees, was working with a fellow professor to update course materials for a specific class, and had written two letters of recommendation for students. *Id.* at 35.

Upon review of Kubik's application, the Journalism Department[4] recommended that Kubik be reappointed. Personnel Rec. Oct. 2012, ECF No. 52, Ex. 8. The Department indicated that Kubik had "potential for professional growth and development." *Id.* at 1. However, the

---

[4] Although the Journalism Department bylaws designate the Personnel Committee as the entity which reviews and makes recommendations on reappointment decisions, that committee is composed of the entire Department. *See* Journalism Dep. Bylaws at 15 ("All tenured and tenure-track faculty in the department shall serve on the Personnel Committee.").

Department did indicate "some concern" about Kubik's "need to find a research niche and 'crank up' both research and service activity. *Id.* The Department's chairperson, the Dean, and the Provost likewise recommended reappointment. *Id.* Although Kubik did not mention this in her application, she also began attending law school part-time in the fall of 2012. Transcript, ECF No. 52, Ex. 7.

Prior to the department meeting where Kubik was presenting her first application for reappointment, Kubik emailed Marron, the Journalism Department Chair, and asked if the order of presentations could be changed so that Kubik would be finished earlier. Sept. 27–28 Emails with Marron, ECF No. 52, Ex. 9. Kubik explained that she needed to pick her son up from daycare at 5:00 p.m. and was worried that the meeting would run over. *Id.* at 1. Marron initially responded by requesting that Kubik make the request the next day at the meeting. *Id.* The next morning, Marron emailed the faculty members who were presenting at the meeting and requested that they keep their remarks to approximately fifteen minutes. *Id.* at 2. Marron explained that "Sara has emailed me that she needs to be able to collect Noah from daycare at 5 p.m." *Id.* Immediately after sending that email, Marron directly emailed Kubik. *Id.* at 3. Marron said that she could not guarantee the meeting would be done by 5 p.m. and asked if there was "anyone, anywhere, whom you can ask to collect Noah from daycare in the event that we have not finished?" *Id.* Marron also explained that, if the meeting had to be postponed until the next week, Kubik would "forfeit [her] rights to compliance with the bylaws' directives regarding the time spans available for review, etc." *Id.*

## 2.

On January 8, 2013, Kubik filed a request for leave pursuant to the Family and Medical Leave Act ("FMLA") with Marron, indicating that she was pregnant and would need leave

beginning on April 21, 2013, and ending on May 15, 2013. Leave Notification, ECF No. 52, Ex. 10. Kubik had not disclosed her pregnancy to Marron prior to requesting the leave. Kubik's request for FMLA leave was granted. *Id.*

On March 12, 2013, Kubik met with Associate Dean Shelly Hinck and Marron for her second Article 6 conference. April 8, 2013 Art. 6 Letter, ECF No. 52, Ex. 11. Hinck and Marron indicated that, with regards to teaching, Kubik was making satisfactory progress for reappointment and tenure. *Id.* at 2. However, they noted that Kubik was only making "limited progress" in her scholarly and creative activity. *Id.* They "encouraged Dr. Kubik to focus her energy on projects that will result in publishable manuscripts." *Id.* at 3. Finally, Hinck and Marron told Kubik that her university service was satisfactory for reappointment, but that her progress, considered in context of the upcoming tenure decision, was limited. *Id.* The report concluded by indicating that Kubik held great promise. *Id.* at 4.

On March 15, 2013, Kubik emailed Hinck regarding whether she could get an extension of her tenure clock because of her pregnancy. Mar. 15, 2013, Email, ECF No. 52, Ex. 12. Hinck advised Kubik to contact Faculty Personnel Services. ECF No. 52, Ex. 15. After talking with Faculty Personnel Services, Kubik had the impression that tenure extensions were "common for those who have a baby." *Id.* Kubik subsequently sent Marron a request for a tenure clock extension for one semester, quoting the CBA provision allowing delay of tenure consideration when the faculty member is dealing with "acute family/personal responsibilities (including child care or the birth or adoption of a child)." Request, ECF No. 52, Ex. 12. Kubik delivered her daughter on April 14, 2013. On April 15, 2013, Marron sent Kubik an email asking Kubik to grade the outstanding assignments in her classes because the students were uncomfortable with adjunct professors determining their grades. Marron April 2013 Email, ECF No. 52, Ex. 14. On

- 10 -

May 9, 2013, while Kubik was still on maternity leave, the Journalism Department's Personnel Committee met, discussed Kubik's tenure extension request, and denied the request. May 9, 2013, Meeting Minutes, ECF No. 52, Ex. 16.

Kubik asked Marron why her request had been denied. Emails, ECF No. 52, Ex. 18. Marron explained that the "discussion revolved around the fact that you did not have an 'extended absence or disability' as you were absent only for the final two weeks of the semester, nor did you seem to have 'unexpected delays in scholarly achievement due to circumstances beyond the control of the bargaining member.'" *Id.* When interviewed about the meeting after the fact, Lori Brost indicated that the faculty also believed that Kubik's pregnancy was not "beyond her control." November 22, 2013 OCRIE Investigation Notes at 3, ECF No. 52, Ex. 17. Brost also stated that because Kubik was able to attend law school, some faculty members thought she was not entitled to an extension. *Id.* Brost also stated that the denial was a difficult decision because this situation had not arisen before. *Id.* at 4. In a May 8, 2013, letter to Dean Ghanem, Marron indicated that her "preference" was to not grant the extension because Kubik's leave had only spanned two weeks of the semester, Kubik had left most of the grading in her classes to be completed by adjuncts, Kubik had fully engaged in teaching and with the department during the semester, and Kubik planned to teach a summer class. May 8, 2013, Marron Letter, ECF No. 52, Ex. 56.

**3.**

On September 3, 2013, Kubik filed a complaint with CMU's Office of Civil Rights and Institutional Equity (OCRIE). Sept. 2013 OCRIE Compl., ECF No. 52, Ex. 19. Kubik outlined the circumstances leading to her request for the tenure extension, the denial of that extension, and the rationale provided. *Id.* She argued that the reasons given for the denial were "not only

offensive," but "discriminatory." *Id.* at 5. OCRIE informed Kubik that the dispute involved the union contract and that it would not investigate for that reason. Sept. 2013 OCRIE Investigation Notes, ECF No. 52, Ex. 20.

On September 10, 2013, Kubik again applied for a tenure clock extension, this time for a full year. Sept. 2013 Tenure Extension Request, ECF No. 52, Ex. 22. In the request, Kubik indicated that she had discussed the previous denial with OCRIE, the Faculty Association Grievance Committee, and the College's deans, and that all had recommended that she reapply for a tenure clock extension. *Id.* at 2. In support of her request, Kubik again explained that she had been pregnant during the fall 2012 and spring 2013 semesters, that she had delivered her daughter in April 2013, and that she has had to devote substantial time to caring for the baby. *Id.* at 2–3. She also explained that both she and her daughter had experienced medical issues recently. *Id.* at 3. Kubik's tenure extension request was eventually granted in May 2014, placing the date for her tenure decision in fall 2017. Armistead Email, ECF No. 52, Ex. 33.[5]

**4.**

On September 20, 2013, Kubik applied for reappointment for the 2015–2016 academic year. Sept. 2013 Reappointment App., ECF No. 52, Ex. 24. In her application, Kubik again discussed the four different courses that she has taught at CMU. *Id.* at 3. She outlined the adjustments she had made in her approach to each class. *Id.* at 3–9. Kubik then outlined her scholarly and creative activities. *Id.* at 10. She admitted that she did not "publish nor present at a conference" during her first year at CMU, and further acknowledged that her "scholarly and creative activities are lacking." *Id.* She then explained that she had presented a paper at a conference in spring 2013, before going on maternity leave. *Id.* She also stated that she did not

---

[5] The delay in the consideration and approval of Kubik's request appears to be because Kubik later filed another OCRIE complaint (discussed below). Kubik's tenure extension request was granted upon completion of OCRIE's investigation.

have the energy during the fall and spring semesters to teach a full load, attend faculty meetings, *and* write, all while pregnant. *Id.* (emphasis in original). Kubik asserted that, because of her "inability to create additional research materials [during the] past academic year," she had requested a tenure clock extension. *Id.* Finally, Kubik listed two works in progress: "The Creation of Imagery used in courts of Law and the Reproduction of it by the Media" and "Defining and Protecting Journalists: The Ever-Evolving Media Shield Laws." *Id.* Kubik listed four professional and public service activities: three workshops and her part-time law schools classes. *Id.* at 11. In terms of university service, Kubik explained that she has served on three committees, written two letters of recommendation, joined a listserv, and discussed with other instructors how to improve a specific course. *Id.* at 12.

Upon review of Kubik's application, the Journalism Department did not recommend Kubik for reappointment, with four in favor of reappointment, five opposed, and three abstentions. Sept. 2013 Minutes, ECF No. 52, Ex. 23. The personnel recommendation form provided the Department's rationale. Personnel Rec. Sept. 2013, ECF No. 52, Ex. 25. At the meeting, a member of the faculty noted that Kubik's student review scores were "decent but not great" and "erratic." *Id.* at 2. Kubik was also asked if she had attended meetings of the Faculty Association, since Kubik was the Department's representative. *Id.* Kubik admitted that she had not attended every meeting, but explained that past representatives had not either. *Id.* Kubik told the faculty that "her service was minimal," but asserted that she "had attended every meeting of the faculty committee and the personnel committee." *Id.* at 3

After Kubik was excused from the meeting, several faculty members raised concerns about her application. *Id.* at 2. One member mentioned that approximately 75% of the grading in Kubik's spring semester class had been outstanding when Kubik went on leave. *Id.* The faculty

then discussed Kubik's scholarship. One member "noted that the department has been 'quite understanding and forgiving.'" *Id.* That member further stated that "'Sara needs to really, really step it up. On research and service, she's woefully inadequate.'" *Id.* at 2–3. The members then discussed how new hires are generally given allowances for poor productivity as they acclimate to the department. *Id.* at 3. The members disagreed about whether non-tenured faculty are expected to immediately produce scholarships, or if little is expected for the first year or two. *See id.* Two members noted that Kubik had been given the benefit of the doubt during her first and second year, but that Kubik was now in her third year at CMU. *Id.* The faculty also discussed how, although Kubik had stated that she had presented at a conference, no supporting documentation of the presentation was provided. *Id.*

The Journalism Department Chairperson, Maria Marron, likewise did not recommend Kubik for reappointment. *Id.* Marron stated that Kubik "taught her classes, but she did not undertake research or contribute to the department's service activities. I do not believe her track record of accomplishment is enough for reappointment." *Id.*

Dean Ghanem, however, overruled the Department and recommended that Kubik be reappointed. *Id.* at 4. Dean Ghanem noted that Kubik had "provided an acceptance note for a proposal she had submitted to the 2013 Aging and Society Conference." *Id.* Dean Ghanem further noted that "the quality of the two presentations was not addressed in the narrative," and "strongly" recommended that Kubik specifically address "the issue of quality in subsequent narratives." *Id.* In summary, Dean Ghanem stated that Kubik's "record needs improvement both quantitatively and qualitatively." She further indicated that "[w]hile I recommend Dr. Kubik for reappointment, I have to stress that Dr. Kubik needs to focus on increasing both her research and service productivity and to improve the quality of her teaching to receive a subsequent

reappointment." *Id.* Provost Gealt subsequently approved Kubik's reappointment, but asserted that "[a]dditional evidence of demonstrated achievement in [the areas of teaching, research, and service] will be an important factor in subsequent personnel recommendations or decisions, at all levels of review." Gealt Letter, ECF No. 52, Ex. 25.

**5.**

On October 14, 2013, Kubik filed a second complaint with OCRIE, alleging discrimination. Oct. 2013 OCRIE Compl., ECF No. 52, Ex. 28. Kubik made several allegations of mistreatment. First, she asserted that Brost, Marron, and Kent Miller[6] had "openly" and "blatantly" opposed the way Kubik was teaching her classes. *Id.* at 2. Kubik further objected to the way Marron treated Kubik's request to present earlier during Kubik's 2012 reappointment meeting. *Id.* Kubik felt that, when Marron emailed the department and indicated that Kubik needed to leave early to pick up her son, Kubik had been singled out in a "totally inappropriate" way. *Id.* Kubik challenged the way her tenure extension request was denied. *Id.* at 3. Kubik additionally explained that Marron had sent an email to Kubik the day after Kubik delivered her daughter, while Kubik was still in the hospital. *Id.* at 4. In that email, Marron asked Kubik to finish grading the outstanding projects in her class. *Id.* at 4; Emails, ECF No. 52, Ex. 14. Next, Kubik asserted that Marron changed Kubik's teaching assignments to a new schedule which involved teaching at 8:00 a.m. five days a week, and gave Kubik's preferred schedule to a male adjunct. *Id.* at 5. Kubik finally faulted Marron for publically criticizing Kubik's handling of her duties as department representative to the faculty union. *Id.* at 6.

On April 14, 2014, OCRIE issued its conclusions. April 2014 OCRIE Determination, ECF No. 52, Ex. 29. OCRIE concluded that Marron created "an unwelcome and hostile

---

[6] Miller is an associate professor in the Journalism Department.

- 15 -

environment." *Id.* at 12. In support of that conclusion, OCRIE cited several facts. First, Marron had referred to Kubik's pregnancy as a "sticky wicket." *Id.* at 11. Second, Marron had emailed Kubik while she was still in the hospital. *Id.* at 12. Third, Marron had indicated that she did not want to grant Kubik's request for a tenure extension because Kubik's pregnancy had only required two weeks off. *Id.* Marron also admitted to giving a male adjunct faculty member a more favorable schedule, and to sharing Kubik's personal family situations with faculty members. *Id.* However, OCRIE found that Marron's conduct was *not* discriminatory "with respect to Kubik's reappointment consideration." *Id.* OCRIE further found no evidence of discrimination by Brost or Miller. Because Marron had left CMU by the time OCRIE reached its conclusions, OCRIE did not recommend any action be taken with regards to Marron. *Id.* However, OCRIE did recommend that the Journalism Department participate in harassment and discrimination training. *Id.*

Marron strongly disputed OCRIE's findings in a May 2, 2014, rebuttal.[7] Marron Rebuttal, ECF No. 52, Ex. 38.  Marron defended her email to Kubik while Kubik was in the hospital, explaining that Dean Ghanem had directed her to email Kubik about the outstanding grading in her classes. *Id.* at 3. Marron further disputed OCRIE's finding that Marron had inappropriately discussed Kubik's personal family issues with the faculty. *Id.* at 4. Marron contended that, although she had mentioned Kubik's childcare responsibilities to other faculty members, she did so because the Journalism Department had a culture of "transparency" and because Kubik had regularly discussed those details with the faculty. *Id.* Marron also disputed Kubik's claim of discrimination regarding the teaching schedule. *Id.* at 5. Marron explained that, despite her efforts to "accommodate faculty wishes," the schedule "changes all the time." *Id.* Marron further

---

[7] On November 26, 2013, Marron filed a complaint against Kubik with OCRIE. Marron OCRIE Compl., ECF No. 52, Ex. 37. Marron withdrew the complaint voluntarily, *id.*, after Marron talked with her attorney, who described the complaint as "retaliatory. Marron Rebuttal at 12, ECF No. 52, Ex. 38.

explained that Kubik had accepted the class schedule instead of recommending an alternative.[8]
*Id.* Additionally, Marron asserted that class schedule conflicts are resolved by looking to
"longevity," not "seniority." *Id.* at 7–8. According to Marron, the male adjunct who received
Kubik's preferred schedule had priority over Kubik because he had been at CMU longer. *Id.*
Marron also explained that Kubik's reappointment application and tenure extension request were
separately considered. *Id.* at 42. In her rebuttal, Marron also accused Kubik of actively creating a
hostile work environment for others in the Journalism Department regarding her reappointment
and tenure extension denials. *Id.* at 20.

On April 18, 2014, Kubik filed a discrimination complaint with the Equal Employment
Opportunity Commission. EEOC Compl., ECF No. 52, Ex. 32. In the complaint, Kubik
reiterated her claims of sex and pregnancy discrimination regarding her reappointment
application and tenure extension request. The EEOC found no actionable evidence of
discrimination at CMU. Mar. 2015 EEOC Dismissal, ECF No. 41, Ex. 30.

On May 29, 2014, CMU's Faculty Personnel Services chose to extend Kubik's tenure
clock by one year, meaning she would be considered for tenure in the fall of 2017. Armistead
Email, ECF No. 41, Ex. 32. The email did not indicate what impact, if any, the extension would
have on Kubik's next application for reappointment.

The discrimination training that OCRIE recommended was not held until December 12,
2014. Training Materials, ECF No. 52, Ex. 35. Prior to the training, several members of the

---

[8] Marron attached an email chain whereMarron and Kubik discussed the class assignments. *See id.* at 34–40. In that
chain, Kubik initially told Marron that she would like to teach two classes in the fall, and that two days of teaching a
week was preferable. *Id.* at 35. However, Kubik also said that if "there are other classes that need teaching, I'm open
to that too." *Id.* Several months later, Marron emailed Kubik with an update on the teaching schedule. *Id.* at 36–37.
Marron offered two options: teaching five days a week starting at 8:00 a.m. each day, or teaching three days a week
with classes ending at 6:15 p.m. *Id.* at 37. In response to an inquiry by Kubik, Marron explained that Kubik was
teaching a 300-level class, instead of a 100-level class, because Marron did not have anyone else to teach the 300-
level class. *Id.* at 36. Kubik then stated that "[b]ased on the options presented, I would prefer to [sic] the schedule
that has me lecturing before 5 pm." *Id.* In that email chain, Kubik did not allege that discrimination motivated the
class schedule assignments or otherwise object to the change in schedule.

Journalism Department questioned whether the training was mandatory[9] and expressed frustration over being forced to attend training that was ordered because of an incident between Marron and Kubik. *See, e.g.*, Emails Regarding Training, ECF No. 52, Ex. 42; Yin Dep. at 43, ECF No. 52, Ex. 71.

**6.**

On April 21, 2014, Kubik attended her annual Article 6 Conference. At the conference, Dean Hinck and Interim Chair Yin discussed Kubik's progress with her. They indicated that Kubik had demonstrated satisfactory progress in her teaching. *Id.* at 1. However, they rated Kubik's scholarly and creative achievement as "limited" in the reappointment context and "unsatisfactory" in the tenure context. *Id.* Hinch and Yin acknowledged that Kubik had presented a peer-reviewed paper at an international conference and "submitted an abstract to" another international conference. *Id.* at 2. But they "stressed the need for Dr. Kubik to submit and publish her research in quality peer reviewed journals." *Id.* They also referenced two works in progress: Kubik was co-editing the translation of a book from Italian to English and was writing an article tentatively entitled: "Gender and Crime Narratives: A Comparative Frame Analysis of Teacher-Student Sexual Assault Cases." *Id.* Hinck and Yin rated Kubik's university service as satisfactory. *Id.* Finally, Hinck and Yin rated Kubik's progress towards meeting the standards of achievement expected of her (Kubik's "promise") as limited, referencing her lack of scholarship in peer-reviewed journals. *Id.* at 3.

On September 20, 2014, Kubik submitted her reappointment application for the 2016–2017 academic year. Reappointment App. 2016–2017, ECF No. 52, Ex. 44. In the application, Kubik summarized the complaints she had filed with the OCRIE and EEOC, the results of those

---

[9] Although OCRIE's determination and conclusion ambiguously "recommended" that training be held, the University Administration clearly explained that the training was mandatory. *See* Armistead Email Aug. 2014, ECF No. 52, Ex. 30.

complaints, and the fact that she had been granted a tenure clock extension in April 2014. *Id.* at 2–3. Kubik began by detailing her student evaluations and improvements she made to her classes. *Id.* at 4–8. Kubik then described her scholarly and creative activities. First, she listed two peer-reviewed publications. The first, titled "Spotting Manipulation in Digital Photographs," was published in the Michigan Bar Journal. *Id.* at 9. The second, titled "Compliance Officers: When Patients Record Health Care Professionals," had been accepted for upcoming publication in Compliance Today, a magazine. *Id.* Kubik's article in the Michigan Bar Journal was reviewed by two practicing lawyers. *Id.* at 10. Kubik explained that "the aim for articles within this journal is to be brief and to the point." *Id.* The article was two pages long and included only two footnotes. Michigan Bar J. Article, ECF No. 52, Ex. 45. Kubik co-wrote the article published in Compliance Today with a practicing health-care attorney. *Id.* at 10. That article was five pages long and included fifteen footnotes. Compliance Today Article, ECF No. 52, Ex. 45.

Kubik then listed two peer-reviewed conference presentations. The first was an upcoming presentation at the Conference for Aging and Society.[10] *Id.* The second was a presentation Kubik had given in spring 2013 about the manipulation of digital images in the media and the courts. *Id.* Kubik also stated that she was a reviewer for the eJournal of Public Affairs. *Id.* Finally, Kubik listed two creative activities: attending law school part-time and attending a seminar on "Diversity and the Law" at her law school. *Id.* at 9. No reference was made to any of the works in progress Kubik had listed in previous applications or in Article 6 conferences.

In terms of service activities, Kubik explained that she was advising 20 undergraduate students, served on seven departmental committees, was the journalism representative to the

---

[10] The topic Kubik presented on appears identical to the topic she wrote her dissertation on. *See* Kubik C.V., *id.* It is unclear whether Kubik's presentation involved additional research or information not published in that dissertation.

Faculty Association, attended several workshops, and participated in several other smaller activities. *Id.* at 12.

On September 26, 2014, the Journalism Department met to consider Kubik's reappointment application. Sept. 2014 Minutes, ECF No. 52, Ex. 46. At the meeting, the Department discussed the difference between "scholarly/academic journals vs. professional/trade journals." *Id.* at 2. Kubik was asked why she included the information about her discrimination complaints. *Id.* Additionally, some "members were concerned with Kubik's thin service record and her absences at faculty, personnel, and other committee meetings." *Id.* Kubik defended those absences by arguing that the Department's environment had been hostile to her, referencing OCRIE's finding that Marron created a hostile workplace. *Id.* Kubik's application for reappointment was denied. *Id.*

In the written personnel recommendation, more information about the Department's decision was provided. Personnel Rec. 2014, ECF No. 52, Ex. 50. First, the recommendation observed that Kubik had published articles not in "scholarly or academic journals, but trade journals." *Id.* at 1. Chair Yin likewise recommended against reappointing Kubik, noting only that "I wish Dr. Kubik's portfolio were stronger." *Id.* at 2. Dean Hinck also recommended against reappointing Kubik. *Id.* She agreed with the faculty's assessment that the publications were in "trade journals," not "academic journals." *Id.* She also stated that "[g]iven that [Kubik] was hired on the academic track, she has not established a record of publishing in scholarly academic journals nor has she indicated that she has scholarly articles ready to submit in the near future." *Id.* She explained: "I do not believe that Dr. Kubik meets the expectations for Scholarly and Creative Activity according to the bylaws of the Journalism Department." *Id.* She further concluded that "I believe that Dr. Kubik's service is limited beyond the department level." *Id.*

- 20 -

Provost Gealt also recommended that Kubik not be reappointed. Gealt Letter, ECF No. 52, Ex. 52. Gealt told Kubik that "your productivity, given the many options you could have chosen, has been inconsistent with what I would expect of a tenure-track faculty member." *Id.* at 2. Gealt further explained that "I believe [the Department's assessment], echoed by your Dean, of the nature of the Michigan Bar Journal and Compliance Today publications is accurate. These publications do not sufficiently represent the academic standards anticipated, and required, by your bylaws." *Id.* at 3. Gealt also mentioned that Kubik had once before not been recommended for reappointment due to concerns about scholarship. *Id.* On February 26, 2015, Gealt sent Kubik a letter rejecting her appeal of his decision and indicating that she would not be reappointed. Gealt Letter Feb. 2015, ECF No. 52, Ex. 53.

Kubik believes that several comments made and actions taken during the reappointment meeting demonstrate discrimination on the part of the Department. First, she asserts that Tim Boudreau slammed a soda can down onto the table several times out of anger. *See* Tr. Reappointment Meeting, ECF No. 52, Ex. 41.[11] Boudreau's anger appears to have stemmed from Kubik's absence at committee and departmental meetings. *Id.* at 2 ("You were missing in action for virtually an entire ah, year, and now you come in here and tell us you've done your work in terms of service."). Faculty members also expressed concern that Kubik had outstanding complaints against the Department or might sue them personally. *Id.* at 6–7. Finally, faculty members questioned whether the upcoming discrimination training was mandatory and expressed displeasure at the idea of being forced to attend. *Id.* at 7–8.

**7.**

---

[11] This transcript was prepared by Kubik herself. Defendants have not furnished a complete alternative transcript of the entire meeting.

On October 1, 2014, Kubik filed another OCRIE complaint, this time against Boudreau, Brost, and Yin. OCRIE Compl. 2014, ECF No. 52, Ex. 58. She referenced Boudreau's angry behavior at the reappointment meeting, objected to Brost's statements alleging that Kubik had created a hostile work environment, and argued that Yin denied Kubik access to evidence. *Id.* at 2–4. OCRIE found, with respect to each faculty member, that there was no actionable evidence of discrimination or retaliation. OCRIE Findings 2015, ECF No. 41, Ex. 39. OCRIE's conclusions revealed several new facts. First, OCRIE represented that, at the reappointment meeting, Kubik had stated that "she intended to publish future manuscripts in legal publications." *Id.* at CMU 203. More importantly, OCRIE asserted that Kubik had "stated that it could take years to publish an article in a traditional scholarly publication, and that it was not her intent to publish in such publications." *Id.* at CMU 204. OCRIE also summarized the Journalism Department's bylaws and standards regarding scholarly activity, concluding that the faculty members had proffered "legitimate, non-retaliatory reasons for [their] decisions as they relate to Complainant's reappointment." *Id.* at CMU 210. OCRIE further found that "there is insufficient evidence to show that Respondent's actions were merely pretext." *Id.*

On January 27, 2015, Kubik filed a second complaint with the EEOC. EEOC Compl. 2015, ECF No. 41, Ex. 44. In the complaint, Kubik alleged that CMU retaliated against her, in response to her previous EEOC complaint, by deciding not to reappoint her. *Id.* The EEOC did not find actionable evidence of retaliation. EEOC Dismissal 2015, ECF No. 41, Ex. 45.

**8.**

On April 3, 2015, Kubik filed a grievance against CMU, alleging that CMU's negative reappointment decision violated the CBA. CBA Grievance, ECF No. 41, Ex. 47. Among other things, Kubik argued that denying her reappointment only a few months after granting her tenure

extension negated the extension. She also argued that the Journalism Department's rationale for recommending that she not be reappointed was based on criteria that was insufficiently specific to comply with the CBA. The CMU Faculty Union represented Kubik during the grievance. *See* Grievance Denial, ECF No. 41, Ex. 49. No evidence was advanced that the union represented Kubik during any of her previous complaints and disputes with the Journalism Department or CMU Administration.

CMU opposed Kubik's grievance. CMU Answer, ECF No. 41, Ex. 48. CMU explained that it was "unreasonable to suppose, and unsupported by fact, that grievant had any right to expect than an extension of her tenure decision would amount to a guarantee of reappointment." *Id.* at 5. CMU also disputed Kubik's assertion that the Department's negative recommendation arose out of animus or was based on insufficient standards. CMU explained: "if it was all a pretext arising out of some animus her peers and fellow bargaining unit members have towards her, then where is accumulation of evidence indicating strength of scholarship and sustained commitment to scholarly and creative activities? There is none." *Id.* at 7.

On July 13, 2015, a neutral arbitrator denied Kubik's grievance. Grievance Denial, ECF No. 41, Ex. 49. The arbitrator explained: "In this case, the Department Personnel Committee and Chair concluded that the Grievant's scholarly and research activities did not demonstrate sufficient progress toward the final goal to warrant reappointment. The Dean and Provost properly utilized their 'independent judgment' in order to assess whether the grievant met the standard for reappointment." *Id.* at 38. In response to Kubik's argument that she only need to show "progress" in her scholarly efforts, the arbitrator explained that the "term 'progress' is not limited to mean a greater number than the prior year. Rather, it suggests ongoing improvement, which also may include quality as well is quantity, is needed." *Id.* Further, the Arbitrator could

not "find any specific act of wrongdoing which would be cause to disregard the Department's ability to evaluate the Grievant's work in connection with scholarly activity." *Id.* at 37.

## II.

Defendants now move for summary judgment. A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

## III.

Title VII provides that: "It shall be an unlawful employment practice for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Discrimination on the basis of pregnancy or related medical conditions is included in the terms "because of sex" and "on the basis of sex." 42 U.S.C. § 2000e(k). Michigan's Elliot Larsen Civil Rights Act (ELCRA) contains similar prohibitions against an employer discriminating against an employee on the basis of an employee's gender or pregnancy. Mich. Comp. Laws § 37.2202(1)(a)–(d). For analytical purposes, the ELCRA

- 24 -

resembles federal law and the same general evidentiary burdens prevail as in Title VII cases. *See In re Rodriquez*, 487 F.3d 1001, 1008 n.2 (6th Cir. 2007); *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004).

For claims brought under Title VII or the ELCRA, courts apply the *McDonnell Douglas* framework.[12] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under *McDonnell Douglas*, "the plaintiff faces the initial burden of presenting a prima facie case of unlawful discrimination." *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (citing *McDonnell Douglas*, 411 U.S. at 802). The plaintiff does so by introducing evidence that she was: (1) a member of a protected class; (2) subject to an adverse employment action; (3) qualified for the position; and (4) was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008) (citing *McDonnell Douglas*, 411 U.S. at 802).

If the plaintiff establishes these four elements, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for taking the challenged action. If the defendant is able to satisfy this burden, the plaintiff must then prove that the proffered reason was actually a pretext to hide unlawful discrimination." *Kroger Co.*, 319 F.3d at 866 (quotation marks omitted) (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000)).

Defendants advance three primary lines of argument. First, they argue that Kubik's ELCRA claims against Boudreau, Brost, and Marron should be dismissed because those Defendants were Kubik's academic colleagues and coworkers, not her supervisors. Second, they argue that Kubik cannot establish a prima facie case of discrimination or retaliation under either the ELCRA or Title VII. Third, they argue that, even if Kubik could establish a prima facie case,

---

[12] Although Title VII and ELCRA claims can also be supported by direct evidence of discrimination, Kubik does not allege that direct evidence exists here. *See In re Rodriquez*, 487 F.3d at 1007.

the Defendants honestly believed that her scholarship was inadequate, and thus Defendants had a non-pretextual reason for their actions. Even drawing all reasonable inferences in favor of Kubik, there is no genuine issue of material fact involving Kubik's claims.

## A.

Defendants first argue that Kubik's ELCRA claims against Boudreau, Brost, and Marron should be dismissed because they were not Kubik's supervisors or managers. Under the ELCRA (and unlike under Title VII), "agents" of an employer can be held individually liable. *See Elezovic v. Bennett*, 274 Mich. App. 1, 8 (2007); *Larkett v. Jones*, No. 14-12723, 2015 WL 4878264, at *9 (E.D. Mich. Aug. 14, 2015). "[P]ersons to whom an employing entity delegates supervisory power and authority to act on its behalf are 'agents.'" *Elezovic*, 274 Mich. at 10. In *Sam Han v. Univ. of Dayton*, the Sixth Circuit affirmed the district court's dismissal of claims against individual defendants under Ohio Rev. Code § 4112.02. 541 F. App'x 622, 629 (6th Cir. 2013). Under that statute, "'employer' liability for discrimination" has been interpreted to apply to "supervisors or managers." *Id.* The plaintiff in *Sam Han* was a non-tenured faculty member at the University of Dayton. *Id.* at 625. However, the plaintiff was given a poor evaluation by a faculty committee responsible for his professional development, and his contract was not renewed based on that evaluation. *Id.* In affirming the dismissal of the claims against the individual defendants, the Sixth Circuit explained: "The members of the [Promotion, Retention, and Tenure] Committee did not have authority over Plaintiff's teaching or writing, they could not give him orders that he had to obey, and they did not have ultimate authority over whether or not he would be retained by University." *Id.* at 629. Similarly, the Journalism Department faculty were responsible for reviewing Kubik's progress and for making a recommendation, but did not have authority to reappoint Kubik. In fact, the Department's first recommendation that Kubik not

- 26 -

be reappointed was rejected by Dean Ghanem. Kubik attempts to distinguish *Sam Han* by arguing that the Sixth Circuit was applying an Ohio statute, but the statutory language is substantially identical. *See* Ohio. Rev. Code § 4112.02. *See also Masi v. DTE Coke Operations, LLC*, No. 06-11592, 2007 WL 2827845, at *7 (E.D. Mich. Sept. 27, 2007) (holding that individual defendants were not liable under the ELCRA because they did not have the authority to rehire the plaintiff).

Kubik cites *Dutt v. Delaware State College* for the proposition that college personnel committee members are agents of the college for Title VII purposes. 854 F. Supp. 276 (D. Del. 1994). In *Dutt*, the department made recommendations regarding reappointment of department members. *Id.* at 278. The CBA provided that the college's Vice President and President would normally recommend reappointment based on a favorable recommendation by the department, but did not specify what those officials would do if the department did not recommend reappointment. *Id.* The *Dutt* Court held that "college employees below the administration level are agents of the college, so long as they participate in the promotion and tenure process to such an extent they significantly control or influence the decisions which govern some aspect of the compensation, terms, conditions or privileges of employment." *Id.* at 282. The Court further concluded that the department faculty members which made the negative recommendation were agents of the college. *Id.* at 283. Defendants attempt to distinguish *Dutt* by arguing that the Court was not analyzing individual liability and that the CBA did not explain whether the subsequent levels of review of a reappointment recommendation were to exercise independent judgment.

Defendants' authority is more persuasive. Although the Journalism Department faculty are responsible for making an initial recommendation, that recommendation is independently reviewed by the Dean and Provost. In *Sam Han*, the plaintiff's nonrenewal was based on the poor

- 27 -

evaluation given by the faculty committee, and yet the individual faculty members were still found to not be agents. Thus, even if the Dean and Provost based their decision to not recommend Kubik for reappointment, in part, on the Department's recommendation, Kubik has not demonstrated that the individual faculty members are agents of CMU. *Dutt* offers support for a broader interpretation of "agent." However, the Sixth Circuit has rejected the expansive interpretation of "employer" under Title VII which the District Court for Delaware was adopting in *Dutt. See Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997). *Sam Han* is directly on point, and any differences in the role or operation of the faculty committee there are insufficient to distinguish Kubik's claims. Defendants Boudreau and Brost are Journalism Department faculty members. They had a vote on whether to recommend Kubik for reappointment, but had no supervisory power over her.

Defendant Marron was, for a portion of Kubik's time at CMU, the Chairperson of the Journalism Department. But the Chairperson does not review reappointment applications independently of the Department faculty. *See* Journalism Dep. Bylaws at 33 ("The chairperson of the Personnel Committee shall be responsible for preparing the report, sharing it with the committee for approval, and providing it to the candidate."). Thus, even though Marron might be construed as Kubik's supervisor, Marron did not have any additional, much less "ultimate," authority over whether Kubik was reappointed. *See Sam Han*, 541 Fed. App'x at 629. Because Defendants Boudreau, Brost, and Marron are not agents of CMU under the ELCRA, they cannot be sued individually.

## B.

Defendants next argue that Kubik cannot establish a prima facie case of sex/pregnancy discrimination, hostile work environment, or retaliation under either Title VII or the ELCRA. As

already mentioned, to establish a prima facie case of discrimination under either statute, Kubik must demonstrate that she was: (1) a member of a protected class; (2) subject to an adverse employment action; (3) qualified for the position; and (4) replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008) (citing *McDonnell Douglas*, 411 U.S. at 802).

## 1.

Defendants argue that Kubik cannot establish a prima facie case of sex/pregnancy discrimination[13] for several reasons. First, Defendants argue that Kubik's pregnancy was too attenuated in point of time from the non-reappointment decision to place her in a protected class. Kubik gave birth to her daughter in April 2013. The Department did not vote to recommend that she not be reappointed until September 2014, and the ultimate decision to not reappoint Kubik was not made by CMU until February 2015. In support, Defendants cite several cases. In *Malone v. USA Today*, the Court held that the plaintiff had not satisfied the first prong of the prima facie case because she "was no longer pregnant when the alleged discrimination began." 348 F. Supp. 2d 866, 875 (E.D. Mich. 2004). In *Malone*, there was a six month delay between the statement the plaintiff alleged was circumstantial evidence of discrimination and the discharge. *Id.* at 874. Importantly, the plaintiff in *Malone* could not point to specific acts of discrimination that occurred while or after she was pregnant, except that her job responsibilities changed. *Id.* at 875.

In *Solomen v. Redwood Advisory Co.*, the plaintiff was terminated from her job eleven months after giving birth. 183 F. Supp. 2d 748, 754 (E.D. Pa. 2002). The Court explained:

---

[13] Kubik appears to be alleging that Defendants discriminated against her because of her pregnancy. As already noted, sex discrimination under Title VII and the ELCRA encompasses pregnancy discrimination. Kubik's complaint does not allege any sex-based discrimination independent of her pregnancy.

- 29 -

As Solomen was not pregnant at or near the time she was terminated, she must present some evidence that she was still "affected by pregnancy, childbirth or related medical conditions" at the time she was terminated. Such a showing might consist of evidence that harassment or discriminatory statements by plaintiff's supervisors began during her pregnancy or maternity leave and continued with some regularity until the adverse employment action occurred. A plaintiff could also adduce evidence that she developed a medical condition during pregnancy that continued to cause problems with her job until the adverse employment action occurred. Essentially, a plaintiff who was not pregnant at or near the time she was terminated must demonstrate that the effects of her pregnancy continued to exist at the time she was terminated, either in actual fact or in the thoughts and actions of those responsible for firing her.

*Id.* (citations omitted)

In *Solomen*, the court noted that the plaintiff was alleging that the company president made several "reprehensible statements" that "would tend to demonstrate . . . discriminatory intent if uttered in close proximity" to the decision to fire the plaintiff. *Id.* But the court concluded that the plaintiff had not established a prima facie case of discrimination because "the statements were made nearly one year before [the defendant] fired [the plaintiff] and she had adduced no evidence of any similar statements during the eight and a half months she worked at [the company] after returning from maternity leave." *Id.* at 755. *See also Brinkman v. State Dep't of Corr.*, 863 F. Supp. 1479, 1486 (D. Kan. 1994) (finding that knee and ankle pain which the plaintiff experienced during and after pregnancy was not necessarily a pregnancy-related medical condition, and thus that the plaintiff had not shown a prima facie case).

In response, Kubik does not identify a single case where the plaintiff satisfied the prima facie case of pregnancy discrimination despite being terminated long after giving birth. Rather, Kubik admits that she bears an additional burden in demonstrating a prima facie case as to the non-reappointment but argues that the Department continued to treat her differently because of her pregnancy long after she gave birth. Specifically, Kubik asserts that she can "demonstrate that the Committee continued to view her harshly for purposefully getting pregnant as a single

- 30 -

woman yet then failing to 'bond' with her children by working a summer semester, taking law classes to bolster her development, and 'using' her children as an 'excuse' to request a tenure clock extension." Pl. Resp. M. Summ. J. at 30, ECF No. 52. But Kubik does not cite to specific examples of this discriminatory treatment.

And more importantly, Kubik's argument does not establish that Kubik was still experiencing effects from her pregnancy, as emphasized in *Solomen*. Kubik makes much of the statements that Marron made during the spring and early summer of 2013, when Kubik asked for the tenure extension and was denied. But Kubik has not demonstrated any specific examples of other discriminatory comments or behavior related to her pregnancy after that time. At best, Kubik argues that the Defendants harbored resentment against her because she filed OCRIE and EEOC claims against Marron. Even if true, that would speak to Kubik's retaliation claim only, not her discrimination claim.[14] Thus, Kubik has not demonstrated that she was a member of a protected class when not reappointed for the 2016/2017 academic year.

Kubik also asserts that the Department's recommendation against reappointment in September 2013 was discriminatory conduct which occurred while Kubik was in the protected class. The Department's negative recommendation in September 2013 occurred five months after Kubik gave birth, and Kubik has not presented any evidence the decision was based on her past pregnancy or that she was still suffering from physical effects of the pregnancy. The September 2013 decision is too attenuated from Kubik's pregnancy for Kubik to show a prima facie case of discrimination. *See Gonzalez v. Biovail Corp. Inter.*, 356 F. Supp. 2d 68, 80 (D.P.R. 2005) ("Courts have generally found that a six-month time span is too far removed to prove discrimination.").

---

[14] Kubik's retaliation claim is discussed below.

- 31 -

Finally, Kubik argues that the tenure extension denial and changes in her teaching schedule were discriminatory conduct that occurred while she was in the protected class.[15] Kubik's initial tenure extension denial and the class schedule changes occurred in May 2013, mere weeks after she gave birth. Thus, Kubik has satisfied the first prong of the prima facie case as to those actions. But neither of those actions were materially adverse changes in her employment. Although the action need not be an "ultimate employment decision" to be a materially adverse employment action, *see White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 802 (6th Cir. 2004), the "change in employment conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 886 (6th Cir. 1996) (quoting *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993)). The change in Kubik's teaching schedule is just that: an alteration of job responsibilities. Although being directed to teach at 8:00 a.m. every morning might be a frustrating inconvenience, Title VII claims cannot be brought based upon "trivial workplace dissatisfactions." *White*, 364 F.3d at 795. *See also Turner v. Sullivan Univ. Sys., Inc.*, 420 F. Supp. 2d 773, 787 (W.D. Ky. 2006) (holding that assignment of unfavorable class schedules did not constitute an adverse employment action, absent evidence of materially adverse consequences).

The denial of Kubik's tenure extension constituted more than just inconvenience or altered job responsibilities. However, if a materially adverse employment action is very temporary, or if "further remedial action is moot and no economic loss occurred," then the de minimis employment action is not actionable. *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000) (citing *Kauffman v. Allied Signal, Inc., Autolite Div.*, 970 F.2d 178, 187 (6th

---

[15] Although Kubik's complaint and response focus primarily on CMU's refusal to reappoint her, she does briefly argue that Defendants took other adverse action against her. For completeness, those other actions will be addressed.

Cir. 1992)). *See also Keeton v. Flying J, Inc.*, 429 F.3d 259, 263 (6th Cir. 2005) ("Other courts have also held that when an otherwise adverse employment action is rescinded before the employee suffers a tangible harm, the employee has not suffered an adverse employment action."); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001) ("[T]he decision to reprimand or transfer an employee, if rescinded before the employee suffers a tangible harm, is not an adverse employment action."). Here, although Kubik's tenure extension was initially denied in May 2013, CMU reversed that decision in May 2014. Although a delay of one year cannot be characterized as "very temporary," Kubik suffered no harm, tangible or otherwise, from the delay. Kubik's tenure extension request was to push the date of her tenure decision back from fall 2016 to fall 2017. The adverse employment action that Kubik suffered was rescinded before she suffered any tangible harm. In short, Kubik has not borne her burden of demonstrating a prima facie case of discrimination.[16]

## 2.

Defendants also argue that Kubik has not established a prima facie case for a hostile work environment claim. Kubik must offer evidence creating a genuine issue of fact that: "(1) she was a member of a protected class; (2) she was subjected to unwelcomed harassment; (3) the harassment was based on sex or race; (4) the harassment created a hostile work environment; and (5) employer liability." *Ladd v. Grand Trunk W. R.R.*, 552 F.3d 495, 500 (6th Cir. 2009). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Additionally, "if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually

---

[16] Having found that Kubik cannot demonstrate a specific prong of the prima facie discrimination case, the Court need not consider Defendants' alternative arguments regarding other prongs of the prima facie case.

altered the conditions of the victim's employment, and there is no Title VII violation." *Id.* at 21–22. In determining whether alleged harassment was "sufficiently severe or pervasive to constitute a hostile work environment . . . [,] the court must consider the totality of the circumstances." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999). The factors to consider "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. Mere offensive utterances are not actionable under Title VII. *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 708 (6th Cir. 2007).

As already explained, Kubik has not provided evidence that she was a member of a protected class at the time the Department recommended that she not be reappointed. Accordingly, there is no hostile work environment claim as to that decision by Defendants. The other circumstances that Kubik asserts created a hostile work environment include "those events pertaining to remarks made to Kubik's colleagues about her familial obligations, the work emails the day after her daughter's birth, the adverse impact to her Fall 2013 schedule, and the denial of her tenure clock extension requests."[17] Pl. Resp. Br. at 33. The email that Marron sent to the Department regarding Kubik's childcare responsibilities, and any other similar remarks Marron might have made, are at worst "offensive utterances." Offhand comments of this sort do not create objectively hostile environments. *See Morris v. Oldham Cty. Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000) (explaining that "simple teasing, offhand comments, and isolated incidents" do not create a hostile working environment).

---

[17] Although Plaintiff's brief does not provide additional details in this section, Kubik is presumably referring to Marron's email to the Department explaining that Kubik needed to leave a meeting at 5:00 to pick up her child, the email Marron sent the day after Kubik gave birth asking Kubik if she could finish the outstanding grading in her classes, and the change in class schedule which meant that Kubik would teach five days a week starting at 8:00 a.m.

Likewise, the email Marron sent to Kubik regarding outstanding grading the day after Kubik gave birth did not create a hostile environment. In the email, Marron explained:

> [a]lmost 70 percent of the grading for your JRN 302 classes is still outstanding. Students are expressing concern about [the adjunct professors] having to grade their final projects and exams, saying they have different standards and expectations and that it's not fair to them–the students–to have the deputizing faculty grade their assignments and determine the final grades for the entire course. I would like to ask that you do the grading and assign the final grades to the students when you return from maternity leave.

Marron Letter, ECF No. 52, Ex. 14.

The email is not threatening, abusive, or hostile. Although the timing of the email might be inconsiderate, the communication was necessary because seventy percent of Kubik's grading was outstanding. Marron does not make any negative comments in the email about Kubik's sex, pregnancy, or medical leave. In fact, Marron makes clear that no action is necessary until after Kubik returns from maternity leave. *Id.* This email is not evidence of a hostile work environment.

Kubik also presents Marron's changes to Kubik's teaching schedule in the fall of 2013 as evidence of a hostile work environment. On May 16, 2013, Marron emailed Kubik, informing her that two classes were in need of an instructor. Marron Rebuttal at 37. Marron offered two alternatives: teaching five days a week starting at 8:00 a.m. or teaching three days a week but ending at 6:15 p.m. *Id.* Kubik asked if she was teaching JRN 101 in the fall as she had originally planned, and Marron explained that she did not have any other instructors available to teach the new classes. *Id.* at 36–37. On May 17, 2013, Marron sent Kubik another email. *Id.* at 36. In that email, Marron offered:

> If you do not wish to teach the JRN 302 classes, I will have to try finding someone to teach the noted sections. I have tried to fashion a schedule for you that will facilitate the department's offering of JRN 302 per the schedule and which

simultaneously will free you up in the evenings and also restrict your schedule to three days a week.

*Id.*

Kubik then replied: "Based on the options presented, I would prefer to [sic] the schedule that has me lecturing before 5 pm." *Id.* There is no evidence in the emails, or elsewhere, that Marron changed the schedule based on Kubik's pregnancy. In fact, Marron had earlier informed the whole Department that "often courses get shifted around and people get slotted into alternative classes." *Id.* at 34. This email exchange provides no evidence of a hostile work environment.

Finally, Kubik argues that the denial of her tenure extension clock created a hostile work environment. As already explained, Kubik suffered no tangible harm from the denial because CMU reversed that decision well before Kubik was scheduled to come up for tenure. In the hostile work environment context, "[w]hen no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). "The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* Kubik filed a complaint with OCRIE objecting to the tenure extension denial. After a reasonable period of investigation, CMU gave Kubik the extension. Given CMU's prompt remediation, Kubik cannot establish employer liability under a hostile work environment claim for the tenure extension denials. Even absent the remediation, a single denial of a tenure extension request is not, by itself, pervasive harassment sufficient to support a hostile work environment claim.

Even considering all of the circumstances and events that Kubik highlights together, Kubik has not shown a prima facie hostile work environment claim. None of the emails or other

communications that Kubik objects to evidence harassment or hostility. The change in Kubik's teaching schedule might have been frustrating or inconvenient, but Title VII is not a "general civility code." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). And because CMU redressed Kubik's tenure extension denial, that action provides no evidence of a hostile work environment.

### 3.

Defendants next argue that Kubik cannot establish a prima facie case of retaliation. To demonstrate unlawful retaliation under Title VII, "the plaintiff must demonstrate by a preponderance of the evidence that: 1) he engaged in activity that Title VII protects; 2) defendant knew that he engaged in this protected activity; 3) the defendant subsequently took an employment action adverse to the plaintiff; and 4) a causal connection between the protected activity and the adverse employment action exists." *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003). The burden of establishing a prima facie case is easily met. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

Defendants first argue that Kubik cannot demonstrate a causal connection between CMU's decision to not reappoint her and the complaints she filed with OCRIE or the EEOC. To establish a causal connection, "the plaintiff must produce sufficient evidence from which one could draw an inference that the employer would not have taken the adverse action against the plaintiff had the plaintiff not engaged in activity that Title VII protects." *Id.* at 543. Kubik argues that the proximity of the adverse employment actions to her OCRIE and EEOC complaints demonstrates that the negative recommendations were retaliatory. However, "temporal proximity, standing alone, is not enough." *Williams v. Serra Chevrolet Auto., LLC*, 4 F. Supp. 3d 865, 879 (E.D. Mich. 2014). Rather, Kubik must demonstrate "but for" causation between the

protected activity and the adverse employment action. *Beard v. AAA of Michigan*, 593 F. App'x 447, 451 (6th Cir. 2014).

Here, Kubik filed her first OCRIE complaint on September 3, 2013. Three weeks later, the Department voted not to recommend her for reappointment. Kubik's reappointment vote was already planned before Kubik filed her OCRIE complaint. Then, on October 14, 2013, Kubik filed her second OCRIE complaint. On April 18, 2014, Kubik filed her first EEOC complaint. Months later, in September 2014, the Department again voted that Kubik should not be recommended for reappointment. On October 1, 2014, Kubik filed a retaliation claim with OCRIE. On November 17, 2014, the Dean recommended against reappointment. And on January 15, 2015, the Provost recommended against reappointment. Even if temporal proximity were enough, the Department's actions here were not immediate. *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). Thus, Kubik must present additional circumstantial evidence of retaliation to satisfy her burden of showing "but for" causation between the protected activity and adverse employment action.

The only additional evidence of retaliation against Kubik, beyond the temporal proximity, is comments made by several faculty members during the September 2014 meeting. Kubik referenced her OCRIE and EEOC complaints in her reappointment materials. *See* Reappointment Application for 2016–2017 at 2–3. Kubik was then asked at the meeting why the complaints were referenced. Boudreau angrily told Kubik that he didn't believe the discrimination alleged in the complaints provided a valid reason for not serving on departmental committees. Sept. 2014 Meeting Tr. at 1–3. Boudreau further stated: "I think there were a lot of folks who were discomforted by the hostile environment that was . . . that existed on this . . . in this department last year. But they managed to make the meetings." *Id.* at 3. Kubik replied: "Are

you blaming me?" *Id.* Boudreau stated: "You draw your own conclusions. I didn't say you. I didn't say anyone. I said there was a hostile environment which you yourself agreed to." *Id.* Boudreau then repeated his belief that Kubik's service record was "paper thin," regardless of the alleged discrimination. *Id.* at 5. Another faculty member, Johnny Sparks, then intervened: "I don't think this dialogue has any influence on how anyone is going to vote and I don't think it's at all productive. I think Tim has made his point and I think you have made yours and I really think we should move on." *Id.* Brost later asked Kubik if she was going to individually sue any members of the Department in the future, explaining that Kubik's past complaints against individual faculty members have been part of the reason there was a "hostile work environment" in the past. *Id.* at 6.

Even construing all facts in a light most favorable to Kubik, she has not satisfied her burden of showing that Kubik's past complaints were the "but for" cause of the negative recommendation. Every time Kubik's progress toward tenure was reviewed, Kubik was informed that her scholarship activities needed improvement. At Kubik's first and second Article 6 conferences,[18] Kubik was told she was making only "limited progress" in scholarship. ECF No 41, Ex. 5; ECF No. 52, Ex. 11. When Kubik was first considered for reappointment by the Journalism Department,[19] she was advised to "crank up" her research. ECF No. 52 Ex. 8. Kubik's first complaint with OCRIE was not filed until September 3, 2013, well after these indications of inadequate scholarship. After Kubik filed her OCRIE and EEOC complaints, the Department's critique of her inadequate scholarly activities continued. Although the critiques might have become harsher after the complaints, there is no indication that Kubik's complaints were the "but for" cause of the negative recommendations. Rather, the record most clearly

---

[18] The first conference was held on February 9, 2012. The second was held on March 12, 2013.
[19] This meeting occurred in October 2012.

supports the conclusion that Kubik was not recommended for reappointment because she had not demonstrated sufficient progress in scholarship even after being told that part of her application needed improvement.

As discussed above, Kubik's scholarship was highlighted as a weak point of her application during her first reappointment application. The Journalism Department did not recommend Kubik for reappointment during her second application. Personnel Rec. Sept. 2013. The recommendation reflects that the faculty believed Kubik had been given a pass during her first application, but that her research was "woefully inadequate," considering that Kubik was in her third year at CMU. *Id.* at 2–3. Dean Ghanem chose to ignore the Journalism Department's negative recommendation and supported Kubik's reappointment, but noted that "Kubik needs to focus on increasing her research and service productivity and to improve the quality of her teaching to receive a subsequent reappointment." *Id.* at 4. Provost Gealt also recommended Kubik for reappointment, but specifically stated that "[a]dditional evidence of demonstrated achievement in [the areas of teaching, research, and service] will be an important factor in subsequent personnel recommendations or decisions, at all levels of review." In Kubik's next reappointment application, she listed two peer-reviewed publications. Reappointment App. 2016–2017. One was two pages long and had two footnotes. The other was five pages long and had fifteen footnotes. The Department determined that both publications were trade journals, not academic journals. Personnel Rec. 2014. Kubik also listed two presentations at academic conferences. Reappointment App. 2016–2017.

As already mentioned, the Journalism Department Bylaws specify that the majority of a faculty member's work should relate to the track onto which that member was hired. ECF No. 52, Ex. 47 at 24. Kubik was hired onto the academic track. In other words, Kubik was in her

- 40 -

fourth year at CMU, and not had published a single article that the Department classified as pertaining to the academic track. She had presented two papers at academic conferences, one of which had been listed in her previous reappointment application. Thus, even after having been repeatedly warned the previous year that her scholarship was inadequate, Kubik provided only one new scholarly activity that pertained to the academic track, and two short articles in trade publications. Even if Kubik's complaints were a factor in the decision not to reappoint her, CMU had other legitimate reasons for that decision. And because Kubik's non-reappointment was motived by legitimate factors, she cannot establish liability. *See Seoane-Vazquez v. Ohio State Univ.*, 577 F. App'x 418, 428 (6th Cir. 2014). Because CMU clearly had legitimate reasons to not reappoint Kubik, she has not satisfied her burden of showing that, but for her complaints, she would have been reappointed.

Kubik clearly believes that the Journalism Department and CMU did not properly interpret and apply the CBA and Journalism Department bylaws. However, courts do not sit as "super tenure committee[s]." *Id.* at 432. "[I]t is not enough for Plaintiff to show that [she] should have [been reappointed]. Plaintiff must create a genuine issue of fact that retaliation was a but-for cause of [her non-reappointment]." *Id.* A neutral arbiter squarely considered whether the process by which Kubik was not reappointed complied with CMU's established procedures and denied Kubik's claim. ECF No. 41, Ex. 49. The issue of whether Kubik should have been reappointed is not one delegated to this Court.

Even if Kubik could demonstrate that the Department's negative recommendation would not have occurred but for her complaints, she has not provided any evidence that Provost Gealt's independent decision against reappointment would not have occurred but for the Department's negative recommendation. Under the so called "cat's paw liability" theory, the plaintiff must

demonstrate that "(1) non-decisionmakers took actions intended to deny Plaintiff tenure in retaliation for his protected conduct, and (2) those retaliatory actions were a but-for cause of [Gealt's] decision to [recommend against reappointment]." *Id.* at 428. Gealt had previously warned Kubik that improvement in her scholarship would be necessary for reappointment. And he indicates that he performed an independent review of her application for reappointment. "Conspiratorial theories based on little more than speculation cannot save a claim from summary judgment." *Id.* at 432. Kubik has not provided non-speculative evidence that Gealt acted out of animus or that his review was not truly independent.[20] No genuine issue of material fact exists involving any of Kubik's claims. For that reason, summary judgment is appropriate.

## IV.

Accordingly, it is **ORDERED** that Defendants' motion for summary judgment, ECF No. 41, is **GRANTED.**

It is further **ORDERED** that Plaintiff Kubik's complaint, ECF No. 1, is **DISMISSED with prejudice.**

Dated: November 28, 2016            s/Thomas L. Ludington
                                    THOMAS L. LUDINGTON
                                    United States District Judge

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on November 28, 2016.

                          s/Michael A. Sian
                          MICHAEL A. SIAN, Case Manager

---

[20] Because Kubik has not established a prima facie case of discrimination or retaliation, the Court need not consider whether Defendants' reasons for not reappointing Kubik were pretextual.